EFFRON, Chief Judge,
with whom ERDMANN, Judge, joins (dissenting):
A drug testing program based upon misapplication of the law governing inspections produced the evidence used to convict Appellant of the charges at issue. The prosecution at trial failed to meet its burden of demonstrating by clear and convincing evidence that the evidence was obtained from a lawful inspection. For the reasons set forth below, I would set aside the findings at issue and remand the case for further proceedings.
I. SEARCHES AND INSPECTIONS
Military law provides a critical distinction between searches and inspections. Under the Military Rules of Evidence (M.R.E.), a search of a person or area for specified property or evidence may be authorized by competent military or civilian authority based upon probable cause. M.R.E. 315. In the absence of probable cause, evidence obtained from a reasonable search is admissible under the limited circumstances specified in M.R.E. 314.
M.R.E. 313, which governs military inspections, contains substantive and procedural provisions that reinforce the distinction between inspections and searches. In pertinent part, the rule defines an inspection as “an examination ... conducted ... as an incident of command the primary purpose of *67 which is to determine and to ensure the security, military fitness, or good order and discipline, of the unit-” M.R.E. 313(b). An inspection may include an examination to ensure that “personnel are present, fit, and ready for duty.” Id. An inspection may include “an examination to locate and confiscate unlawful weapons and other contraband,” and may include an order “to produce body fluids, such as urine_” Id. However, an “examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection” under the rule. Id. In short, the determination of whether an examination constitutes an inspection or a search depends on its primary purpose.
When “a purpose of an examination is to locate weapons or contraband,” the rule sets forth a specific procedure for determining whether the examination is a search or an inspection. Id. In pertinent part, the rule provides that when “specific individuals are selected for examination ... the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule.” Id.
Depending on the circumstances, a drug test designed to locate illegal substances may constitute an inspection or a search. As with any other examination for contraband, the determination of whether a drug test is an inspection or a search depends on whether the prosecution can meet the burden of establishing by clear and convincing evidence that the circumstances constituted an inspection under the rule. The distinction is crucial. If the examination is a search, the evidence is inadmissible unless the prosecution can establish that the search was an authorized probable cause search under M.R.E. 315, or that the search fits within an exception under M.R.E. 314. If, however, the prosecution establishes by clear and convincing evidence that the examination constituted an inspection, then the evidence is admissible without regard to the requirements of M.R.E. 314 or 315. See M.R.E. 313(a).
II. THE DRUG TESTING PROGRAM DESIGNED BY THE SJA
In the present case, the SJA recommended that the unit commander approve and implement the SJA’s proposal for a “Urinalysis Re-Inspection Policy.” Under the SJA’s proposed policy, servicemembers whose urine tested positive for illegal drugs would be required to provide another sample for testing. The SJA included with his policy proposal an “attached memorandum” for the commander to sign to implement the program.
The SJA’s recommendation memorandum describes, defends, and recommends a program of drug testing that focuses expressly and directly on the prosecution of drug cases. The SJA informed the commander that: “If the only evidence available at trial of illegal drug use is the positive urinalysis test, court members are frequently hesitant to convict the member for illegal drug use.” The SJA expressed concern that “the increased opportunity for acquittal in illegal drug use prosecutions based solely on a positive urinalysis test,” meant that “more often than not, the accused elects to litigate his case at trial,” leading to “costs associated with such litigation .... ”
The SJA further stated that the proposed policy would remedy this problem by creating the potential for the court-martial to consider two positive test results. In his opinion, that would “increase[ ] the likelihood of conviction if the trial is litigated”; establish “a significant! ] likelihood that the member would plead guilty”; and ineentivize members to “request early and rapid disposition of charges associated with the initial positive test before the results of the second test are known.” The SJA recommended that the commander establish the retesting program “to further aid in detecting drug abusers within our active duty population, potentially decrease litigation risks and costs, and potentially aid in swifter judicial action.”
The SJA’s recommendation memorandum, infused with concern about the litigation of drug cases, constituted a proposal to use drag testing “for the primary purpose of obtaining evidence for use in a trial by court- *68 martial or other disciplinary proceedings.” M.R.E. 313(b). As such, the proposal amounted to a proposal to conduct searches, not inspections. See id.
III. THE COMMANDER’S IMPLEMENTING MEMORANDUM
Two days after receiving the SJA’s proposal, the commander signed an implementing memorandum entitled “Urinalysis Re-Inspection.” The implementing memorandum set forth the program’s requirements and included the following:
The purpose of urinalysis inspection is to ensure the [sic] security, military fitness, and good order and discipline. To fulfill that purpose, follow-up urinalysis will be utilized as a continuation of the original random inspection. The unlawful use of controlled substances by a member of this installation has the potential to seriously undermine our missions, endanger the lives of other members, and negatively impact the nation’s security. Follow-up urinalysis inspections are part and parcel to the random urinalysis inspection program [at the base], and not a criminal investigative tool, regardless of the admissibility of such test results as evidence in Uniform Code of Military Justice actions. Followup urinalysis inspections should not interfere with or impede any potential criminal investigation.
Subsequently, at trial, the Government introduced into evidence a two-paragraph affidavit from the commander taken approximately twenty months after implementation of the policy. In the affidavit, which echoed the implementing memorandum, the commander stated:
The purpose of the policy was to ensure security, militaxy fitness, and good order and discipline. As I stated in the 1 Feb 07 memorandum, the unlawful use of controlled substances by a member assigned to the installation has the potential to seriously undermine the mission, endanger the lives of other members, and negatively impact national security. Follow-up urinalysis inspections are part of the random urinalysis inspection program at Davis-Monthan AFB, and not a criminal investigation tool.
In the present appeal, the findings at issue were based on evidence obtained under the retesting program. The military judge denied a defense motion to suppress the evidence, ruling that the retesting program constituted a valid inspection.
IV. DISCUSSION
The SJA provided the commander with a detailed recommendation for a program that would serve the purpose of enhancing the prosecution’s litigation posture in drug testing cases. Under M.R.E. 313(b), an “examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule.” Do the brief statements in the implementing memorandum, echoed in the commander’s affidavit, meet the Government’s burden to establish by “clear and convincing evidence that the examination was an inspection” under M.R.E. 313(b)?
The SJA’s policy proposal to the commander came in the form of a recommendation. As such, the commander was free to reject the SJA’s views. In the two-day period between receipt of the SJA’s recommendation and issuance of the commander’s implements ing memorandum, it is possible that the commander engaged in or otherwise obtained independent legal research, identified the deficiencies in the SJA’s proposal, rejected the SJA’s approach, and drafted his own implementing memorandum. Did the prosecution prove, by clear and convincing evidence, that the commander did so?
The Government had the opportunity at trial to demonstrate that the implementing memorandum signed by the commander differed from the draft attached to the SJA’s recommendation memorandum, but the Government did not place the draft into evidence or otherwise offer evidence on that matter. The Government had the further opportunity to offer testimony by the commander, the SJA, or other officials to demonstrate that the commander had rejected the policy’s pur *69 pose expressed in the SJA’s recommendation memorandum. The Government did not do so. The prosecution offered no evidence on those points, and the military judge entered no findings of fact as to whether the commander had rejected or adopted the views of his SJA.
The record in this case reflects two competing narratives. In one, the SJA drafted a policy for an improper purpose, provided the commander with an implementing memorandum that masked that purpose behind the facade of an inspection policy, and the commander adopted the policy in that context. In the second, the SJA drafted a policy for an improper purpose, the commander rejected that purpose, and the commander drafted a new implementing policy with a proper purpose. In the face of the SJA’s detailed and unambiguous recommendation that the commander adopt a program to produce evidence for use in courts-martial, the prosecution was obligated to fill in the details — to demonstrate by clear and convincing evidence that the commander rejected the SJA’s improper purpose for the program and that he authorized an inspection program for a proper purpose. The prosecution did not do so. Because the prosecution failed to meet its burden, I respectfully disagree with the majority’s decision to affirm.